UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ROBERTO NUNEZ,                  )
                                )
            Plaintiff           )
                                )
      v.                        )   Case No. 2:04 cv 453
                                )
JO ANNE B. BARNHART,            )
COMMISSIONER OF SOCIAL SECURITY )
                                )
            Defendants          )

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment or Remand filed by the Plaintiff, Roberto Nunez, on April 4, 2005. For the following reasons, the motion is **GRANTED**.

Background

The plaintiff, Roberto Nunez, first applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on April 30, 1998, alleging an onset date of June 5, 1995. (Tr. 84) The claim was denied, and Nunez did not appeal.(Tr. 84) Nunez filed a second claim for DIB and SSI on December 21, 2000 alleging the same onset date of June 5, 1995. (Tr. 84) The claim was denied once again at the administrative level, and Nunez requested a hearing before an Administrative Law Judge ("ALJ") on January 4, 2002. (Tr. 103)  ALJ William J. Wilkin conducted a hearing on November 18, 2002 and subsequently found that Nunez was disabled beginning December 10, 2001 but not during the period of March 24, 2000 through December 9, 2001. (Tr. 84-93)  The practical effect of this decision was that Nunez

receives SSI, but not DIB because Nunez's insured status expired on March 31, 2001, before he was found disabled.

Upon Nunezís request for reconsideration, the Appeals Council affirmed the favorable portions of the ALJ's first decision, but remanded the unfavorable portion because the November 2002 hearing tape had been lost. (Tr. 128) As a second basis for remand, the Appeals Council directed the ALJ to resolve a conflict between Nunez's former treating physician, Dr. Nirav Chudgar, and the opinion of consultative examiner, Dr. Kanayo Odeluga, in regard to Nunez's RFC as of March 24, 2001. (Tr. 128-29) Following a new hearing on February 25, 2004, ALJ Wilkin again denied Nunez's claim for DIB for the period of March 24, 2000 through December 9, 2001 in a written decision dated April 27, 2004. (Tr. 19) Nunezís request for reconsideration was denied on August 27, 2004. (Tr. 7) On February 2, 2005, Nunez filed a complaint in this court.

In order to qualify for disability insurance benefits for March 24, 2000 through December 9, 2001, Nunez must show that he became disabled prior to March 31, 2001. (Tr. 86)

Nunez was born on January 9, 1958 and was 46 years old at the time of the second ALJ hearing. (Tr. 32) He is 5í10" and weighs 180 pounds. (Tr. 32) He does not currently smoke or drink. (Tr. 53) Nunez lives in a home with his mother in East Chicago, Indiana. (Tr. 34) He completed high school in a special education program and has training and certification for welding. (Tr. 34-35, 175) Nunezís relevant employment was as a field operator from

2

1988 to 1995. (Tr. 157) As a field operator, Nunez mixed and agitated chemicals according to instructions and checked valves at various locations on the job site. (Tr. 36-38) In this job, Nunez lifted up to 50 or 100 pound sacks of material. (Tr. 39, 157) In 1995, Nunez was terminated due to a personal dispute with a co-worker. (Tr. 39-40)  He has not been gainfully employed since 1995. (Tr. 40)

Nunez received care from Dr. Chudgar and Dr. Jayesh M. Madhani of the Whiting Medical Center from July 1998 through November 2001.  (Tr. 207-49)  Although the majority of treatment notes are unsigned, Dr. Chudgar clearly began treatment in 1998, and Dr. Madhani was treating Nunez at least as early as August 2000. (Tr. 249, 323) On July 6, 1998, Dr. Chudgar noted that Nunez had been diabetic since 1996 and was complaining of sharp chest pain occurring daily, along with occasional back and neck pain. (Tr. 248) He found that Nunez had controlled insulin-dependent diabetes mellitus, observed that his back was tender, and diagnosed peripheral neuropathy. (Tr. 248-49) On August 6, 1998, Nunez again complained of neck pain. Upon examination, Dr. Chudgar found that Nunez's posterior neck was tender and diagnosed diabetic neuropathy. He also noted that a nitro patch somewhat reduced Nunez's chest pain. (Tr. 246) On August 25, 1998, Dr. Chudgar ordered an EMG to address Nunez's complaints of numbness, but Nunez was unable to undergo the procedure because of medical complications. (Tr. 237, 245)  On September 1, 1998, Nunez reported back pain which Dr. Chudgar treated with Motrin.

3

He also diagnosed uncontrolled diabetes, hypertension, hypercho-
lesterolemia, and coronary artery disease. (Tr. 244)   Nunez
underwent triple bypass surgery in mid September 1998. (Tr. 40)
On October 14, 1998, Nunez told Dr. Chudgar that he had chest
pain, as well as burning pain in his right thigh and burning with
numbness in his left foot. (Tr. 242) Dr. Chudgar concluded that
Nunez was experiencing neuropathy secondary to his diabetes and
prescribed Elavil. (Tr. 242) On December 7, 1998, Nunez returned
with complaints of burning and numbness in the right thigh and
burning in the left knee, which Dr. Chudgar continued to attrib-
ute to neuropathy. (Tr. 240) On January 12, 1999, Dr. Chudgar
increased Nunez's prescription for Elavil. (Tr. 239)

On March 26, 1999, Nunez visited Dr. Chudgar for tingling
and numbness in his hands and feet, numbness in the upper right
arm, leg pain and numbness, and neck pain. (Tr. 237) On June 23,
1999, Nunez reported tingling and numbness in both legs and hands
as well as cervical pain, but no weakness. Dr. Chudgar prescribed
a trial with vitamin B12 shots and changed Nunez's medications
for neuropathy to Tegretol and Tylenol. (Tr. 234). An EMG taken
July 30, 1999 was "significant for decrease in number of motor
units in almost all muscles" tested in both legs and gave the
impression of "abnormal study consistent with a sensory motor
polyneuropathy." (Tr. 271) Throughout the remainder of 1999,
Nunez continued to complain of symptomology consistent with
neuropathy. (Tr. 232-33)

4

On March 30, 2000, Dr. Chudgar completed a short Physician's Statement in which he opined that Nunez was temporarily totally disabled due to both mental problems, heart disease, and uncontrolled diabetes as of September 1998. (Tr. 309) He stated that he would reassess Nunez's condition after completing a full work-up. (Tr. 309)

On June 22, 2000, Nunez reported increased pain in both legs, and on July 19, 2000, he told Dr. Chudgar that he was experiencing numbness in his hands and fingers as well as blurred vision and chest pain. (Tr. 230-31)   Dr. Chudgar started Nunez on Neurontin for these symptoms. (Tr. 230)   On July 6, 2000, Dr. Chudgar completed a report for the Disability Determination Bureau ("DDB") in which he diagnosed Nunez with coronary artery disease, congestive heart failure, insulin dependent diabetes, hypercholesterolemia, and peripheral neuropathy. (Tr. 315).   Dr. Chudgar stated that Nunez had limitations in sitting, standing, walking, lifting, pushing/pulling, squatting, crawling, climbing, driving, repetitive leg movements, and exposure to dust, fumes or gases. He further stated that Nunez would have pain if he exceeded his ability to sit. (Tr. 317)

On August 19, 2000, Nunez underwent a left heart catheterization to assess the cause of his ongoing chest pain. (Tr. 323) Following this procedure, Nunez reported that he felt better and that he still had occasional chest pain, but less frequently. (Tr. 223)

5

On September 20, 2000, Dr. Chudgar completed a Residual
Functional Capacity Assessment ("RFC") for Nunez in which he said
that Nunez could lift less than 10 pounds due to his heart
problems and peripheral neuropathy. He opined that Nunez had an
unlimited ability to sit but that he could walk and stand for a
maximum of one hour during an eight-hour day, or for less than
one-half hour continuously. (Tr. 302-03)  Nunez could not climb
or crawl but could balance, stoop, or crouch for up to one-third
of the day, although he was limited in his ability to push/pull
and could not work around heights, moving machinery, dust, or
humidity and needed to rest in a reclined position once during
the day. (Tr. 304) In Dr. Chudgar's opinion, Nunez's diabetes
mellitus and vasculitis caused "significant and persistent
disorganization of motor function in two extremities" that
resulted in "sustained disturbance of gross and dexterous move-
ments." (Tr. 306-08)

On January 31, 2001, Dr. Chudgar completed a second assess-
ment for the DDB in which he diagnosed Nunez with coronary artery
disease, hypertension, angina, diabetes mellitus, congestive
heart failure status post coronary artery bypass and neuropathy.
(Tr. 338) The onset date of diabetes was 1997, and the onset date
for the neuropathy was February 1999 (Tr. 338) The report also
indicated that Nunez still was experiencing substernal "stabbing"
cardiac chest pain two to three times a week. (Tr. 338) In
addition, Chudgar indicated bilateral neuropathy in both upper
and lower extremities. (Tr. 340)

6

On March 31, 2001, Nunez's eligibility for disability benefits expired.

On April 13, 2001, either Dr. Chudgar or Dr. Madhani noted that Nunez was experiencing weakness in his hands in addition to his other neuropathy. (Tr. 213)  On July 24, 2001, he reported left knee pain, although an x-ray taken in June showed mild osteopenia without fracture, dislocation, or arthritic change. (Tr. 210, 254)

On April 19, 2001, Disability Officer J. Fenn spoke with Nunez and reported that he had problems with learning, following instructions, and reading in school, as well as with a speech impediment. (Tr. 175) He reported that his medications made him drowsy, impeded his memory, and caused an inability to focus or pay attention to detail. (Tr. 175) The next day, Nunez's sister told Fenn that Nunez could take care of his personal needs and do "simple activities" around the house without assistance, but that longer instructions were difficult for him to comprehend and that instructions needed to be broken down into parts. (Tr. 176)  She also reported that Nunez slept a lot and had become short tempered recently. (Tr 176)

On May 10, 2001, Dr. Kanayo Odeluga evaluated Nunez for the DDB. (Tr. 342-46)  Dr. Odeluga reported that Nunez had "pain on both legs with glove and stocking paraesthesia that is worse with walking" but no bone or joint pain, swelling, or stiffness. (Tr. 343) He further stated that Nunez could not walk around to shop. (Tr. 343) Examination, however, yielded normal musculoskeletal

7

and normal results including range of motion, sensation, and
strength. (Tr. 344-45) Dr. Odeluga also did not observe Nunez
have any difficulty getting on and off the exam table, tandem
walking, walking on toes or heels, squatting, or hopping. (Tr.
345) Dr. Odeluga concluded that Nunez had diabetes mellitus,
hypertension, coronary artery disease, unstable angina, diabetic
neuropathy, and obesity. (Tr. 345)

On May 29, 2001, Dr. Kalyani Gopal and Dr. Alan S. DeWolfe
administered the Wechsler Adult Intelligence Scale-III (WAIS-III)
and the Wechsler Memory Scale-III (WMS-III) to Nunez for the DDB.
(Tr. 347) The result of the WAIS-III is as follows: Verbal IQ of
70, Performance IQ of 83 and Full Scale IQ of 73, which reflected
the borderline range of intellectual functioning.  (Tr. 348-49)
Drs. Gopal and DeWolfe also reported that Nunez was able to
answer simple questions and did not have any trouble following
instructions, although some instructions had to be repeated. (Tr.
348) Nunez tested within the "normal" range for the WMS-III
evaluation,  indicating that Nunez does not have any memory
difficulty. (Tr. 349) The physicians diagnosed Nunez with a GAF
of 65. (Tr. 349)

On May 31, 2001, Dr. W. Bastnagel completed an RFC for the
DDB. (Tr. 361-69) In this assessment, Dr. Bastnagel opined that
Nunez was able to lift 20 pounds occasionally, 10 pounds fre-
quently, stand for at least two hours and sit for about six hours
in an eight-hour work day, with unlimited abilities to push and
pull. (Tr. 362) He further stated that Nunez occasionally could

8

climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but never climb a ladder, rope or scaffolding. (Tr. 363) He did not find that the evidence showed manipulative, visual, or communicative limitations, but he indicated that Nunez should avoid extreme heat and cold. (Tr. 364-65) Finally, Dr. Bastnagel stated that Nunezís allegations of symptoms were "credible." (Tr. 366)

On June 21, 2001, consulting physician Dr. J. Pressner completed a Psychiatric Review Technique ("PRT") concluding that an RFC assessment was necessary because Nunez's borderline intellectual functioning did not precisely satisfy the diagnostic criteria for Listing 12.05, mental retardation. (Tr. 375, 379) Dr. Pressner found that Nunez had moderate restrictions in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace and no instances of repeated episodes of decompensation. (Tr. 385)  The same day, Dr. Pressner completed a mental RFC in which he found that Nunez had a markedly limited ability to understand, remember, and carry out detailed instructions. (Tr. 354) He opined that Nunez was credible to the extent that he alleged problems reading and writing but not with respect to memory and concentration deficits.  He also concluded that Nunez did not have a mental disorder that would interrupt his social functioning. (Tr. 356)  He commented that Nunez "seems capable of maintaining an ordinary routine without special supervision and observing usual safety precautions." (Tr. 356) He

9

found that Nunez did not have trouble relating to others, seeking assistance, or attending to a task for an extended period of time at a normal pace. (Tr. 356) Finally, he stated that Nunez was capable of maintaining a regular schedule and any absenteeism would not be related to Nunezís mental condition. (Tr. 356) Pressner concluded, "although the claimant has a severely limiting condition, it appears that the claimant retains the ability to perform simple, repetitive tasks on a sustained basis without extraordinary accommodations." (Tr. 356)

On October 30, 2001, Nunez completed a daily activities questionnaire in which he claimed to sleep approximately 12 hours each night in addition to a two hour nap each day. (Tr. 187, 196) He said that his mother prepared all of his meals and that weakness and chest pain prevented him from doing any work around the house. (Tr. 190) Nunez further reported that he went grocery shopping once a month with assistance and ran errands once a month, although he rarely drove himself. (Tr. 192) He described his hobbies as reading the daily newspaper and watching television, and he claimed to have trouble concentrating and remembering the days and times of the programs he watches. (Tr. 193-194) Nunez reported no problems with working before his medical condition began in 1995 and stated that he left work because of a heart attack. (Tr. 195) Nunez described his overall symptoms as weak, dizzy, drowsy, sleepy, numbness in hands and feet, difficulty opening his hands, and chest pain. (Tr. 196)

10

On November 27, 2001, Dr. J. Pressner reviewed the medical evidence and concluded that Nunez was "mildly to moderately mentally retarded" due to his I.Q. of 70. (Tr. 359) Dr. Pressner also noted that the July 1999 EMG showed sensory-motor neuropathy, but without citation to the record, he stated that Nunez could do yard work with help from his mother. (Tr. 359) He also noted that Nunez's treatment notes from August and October 2001 state that Nunez did not have any chest pain. (Tr. 359)

On December 10, 2001, Dr. Madhani completed an RFC form in which he stated that Nunez always had chest pains, pain in both legs, and pain and tingling in both hands with difficulty opening his hands. (Tr. 370)  He described Nunez's symptoms as chest pain, weakness, dizziness, numbness, tingling, drowsiness, and sleepiness. (Tr. 370) Dr. Madhani opined that Nunez was completely and totally disabled, that he could barely walk one block due to neuropathy in both feet, that he could sit for no longer than 30 minutes before experiencing chest pain, and that he could stand no more than 20-30 minutes before experiencing leg, feet, and chest pain. (Tr. 372)  He stated that Nunez could not sit for very long and should not lift more than 10 pounds. (Tr. 373) He placed the onset of these symptoms as 1995. (Tr. 375)

In his first decision, ALJ Wilkin adopted Dr. Madhani's December 10, 2001 RFC to find Nunez disabled as of that date. (Tr. 89) He also adopted Dr. Chudgar's September 2000 RFC as an explanation of Nunez's abilities from March 25, 2000 through December 9, 2001. (Tr. 88-89)  The portion of the ALJ's decision

11

finding Nunez capable of work under this earlier RFC is the
section vacated by the Appeals Council (Tr. 128-29)

During the ALJ hearing on February 25, 2004, Nunez testified
that he has experienced ongoing chest pain since his bypass
surgery in 1998. (Tr. 44) He also had pain in his legs since
1997, when he was diagnosed with diabetes. (Tr. 46) He further
testified that he had arthritis in his neck as well as carpal
tunnel since 2002. (Tr. 47-48) Nunez said that he was constantly
sleepy, drowsy, and tired due to his medications and estimated
that he began sleeping a lot in 1999. (Tr. 49, 57) He said that
he stopped doing chores at home around 1998 or 1999. (Tr. 60)
With respect to his physical abilities, he affirmed that at the
first ALJ hearing, he stated that he could sit for 25-30 minutes,
could walk half a block, and carry 5-10 pounds. (Tr. 54). He also
claimed memory loss. (Tr. 55)

After Nunez's testimony, the ALJ posed five hypotheticals to
Vocational Expert ("VE") Leonard Fisher. For a 46 year old
claimant with a 12th grade education and Nunez's work experience
who was limited to light work with no repetitive walking, climb-
ing, or crawling, no heights and no moving machinery, and could
perform only simple one and two-step repetitive work, VE Fisher
stated that Nunez could perform 15,000 assembly, 4,000 inspector,
1,300 ushering, or 15,000-20,000 cashier jobs. (Tr. 70) In
response to a second hypothetical for sedentary work with the
same restrictions, Nunez could perform 2,000-3,000 surveillance
systems security monitor, 300 taper printed circuit layout, 800

12

document preparer/microfilming, 300 film touch-up inspector, 300
semi-conductor bonder, and 300 electrical assembler jobs. (Tr.
71) The same occupations were available in the third hypothetical
with the additional limitations of carrying five to 10 pounds,
walking one hour per eight-hour day, with no limit on sitting,
never climbing or crawling, and no heights or moving machinery.
(Tr. 72) Fisher testified that Nunez would not be able to find
any full-time employment if the RFC was light sedentary and he
was unable to sustain eight hours of work. (Tr. 72) In the final
hypothetical, the ALJ asked Fisher if the jobs listed in hypo-
thetical number two still could be performed if the individual
had a low degree of concentration. (Tr. 73) Fisher stated that
the jobs he referred to were classified with a specific voca-
tional preparation ("SVP") of two.  If the level of concentration
corresponded, Nunez would be able to perform those jobs. (Tr. 73)

    On cross-examination, VE Fisher agreed that the jobs listed
in hypothetical number two would require repetitive use of the
hands and good bilateral manual dexterity. (Tr. 73-74) In addi-
tion, if Nunez needed to rest in periods other than the noon hour
and the regular breaks in the morning and afternoon, he would not
be capable of performing any of the jobs listed. (Tr. 74) Fur-
ther, if Nunez was unable to remain awake during the entire work
day he would not be able to perform any of the jobs listed. (Tr.
75)

    In his April 27, 2004 decision denying benefits for March
25, 2000 through December 10, 2001, ALJ Wilkin incorporated his

13

summary of the evidence from his first December 2002 decision,
including his finding that the evidence did not reflect arthritis
or a severe mental impairment.  (Tr. 21, 128-29) In the 2002
decision, the ALJ considered Nunez's scores on the WAIS-III, but
he noted that the memory test yielded mostly normal results, that
there was no evidence of other psychological problems, and that
Nunez had worked in a number of unskilled and low-end semi-
skilled occupations with an excellent earnings history. (Tr. 87)
He also noted that Nunez did not report a mental impairment
beyond memory problems at the 2002 hearing. Thus, ALJ Wilkin
concluded that Nunez's mental impairments were not severe because
Nunez "is not significantly limited in his mental ability to
perform basic work activities, such as understanding, remembering
and carrying out simple instructions; using judgment; dealing
with changes in a routine work setting; and responding appropri-
ately to supervision, co-workers and usual work situations." (Tr.
87) He did not revisit this determination in the 2004 decision.
(Tr. 21)

     With respect to Nunez's physical impairments, ALJ Wilkin
concluded that the records through December 2001 did not contain
any definitive reference to arthritis, depression, or carpal
tunnel syndrome. (Tr. 21) He otherwise affirmed his findings in
the 2002 decision that Nunez was impaired by "'severe' diabetes
mellitus with peripheral neuropathy, hypertension, and a history
of coronary artery bypass surgery x 3." (Tr. 21)

14

Turning to Nunez's RFC, ALJ Wilkin found that Nunez could perform a "significant range of sedentary work" during the relevant period. (Tr. 24) Specifically, he could perform simple one-two step jobs, could lift up to 10 pounds and "occasionally carry items such as docket files, small tools and ledgers," occasionally stand and walk, sit without restriction, but never repetitively walk, climb, crawl, or work around heights or moving machinery. (Tr. 23)

In support of this RFC, the ALJ found that Nunez was reasonably credible in describing his symptoms as of 2004, but that the evidence did not support that he had the same level of disability prior to December 10, 2001. (Tr. 22) He noted that in 2004, Nunez still was capable of driving 10 miles and walking one-half block. He observed that Dr. Odeluga recorded "benign" results at the May 2001 consultative evaluation and that the Whiting Clinic records from Nunez's treating physicians consistently showed intact neurological signs. (Tr. 22) ALJ Wilkin also considered Dr. Pressner's opinion that Nunez could perform a wide range of light work in November 2001. (Tr. 22-23) Thus, the ALJ opined that Dr. Chudgar's September 2000 RFC, which he had adopted in his first decision, was "a bit more restrictive" than the "other substantial evidence of record." (Tr. 23) However, ALJ Wilkin acknowledged that peripheral neuropathy was one of the manifestations of diabetes and that Nunez had been medicated for hypertension and angina since the late 1990s. (Tr. 23) Based on these consider-

15

ations, the ALJ determined that Nunez could perform the jobs VE Fisher suggested in response to the ALJ's second hypothetical.

<u>Discussion</u>

The standard for judicial review of an ALJís finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. ß405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting Consolidated Edison Company v. NRLB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJís decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  *Lopez*, 336 F.3d at 539.

16

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act   The claimant must show that he is unable

> to engage in any substantial gainful activity by reason of any medically determinable phys- ical or mental impairment which can be ex- pected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

> 42 U.S.C. ß423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen- tial evaluation to be followed when determining whether a claim- ant has met the burden of establishing disability.  20 C.F.R. ß404.1520.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. ß404.1520(b).  If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combi- nation of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. ß404.1520(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regula- tions.  20 C.F.R. ß401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of his past work.  If, at this fourth step,

17

the claimant can perform his past relevant work, he will be found
not disabled.  20 C.F.R. ß404.1520(e).  However, if the claimant
shows that his impairment is so severe that he is unable to
engage in his past relevant work, then the burden of proof shifts
to the Commissioner to establish that the claimant, in light of
his age, education, job experience and functional capacity to
work, is capable of performing other work and that such work
exists in the national economy.  42 U.S.C. ß423(d)(2); 20 C.F.R.
ß404.1520(f).

    Nunezís first argument in support of remand is that the ALJ
overlooked his mental impairments resulting in error at Steps Two
and Three. Nunez makes two arguments regarding his mental impair-
ments: first, that his mental impairment is severe and second,
that he meets listing 12.05(C) for Mental Retardation. 20 C.F.R.
Pt. 404, Subpt. P, App. 1 ß12.05.

    If a mental impairment has more than a minimal effect on the
claimant, a finding that the impairment is "severe" is required.
SSR 96-3p at *1. Since severity is an early determination, a
finding of "not severe" is warranted when the evidence estab-
lishes only "a slight abnormality (or a combination of slight
abnormalities) that has no more than a minimal effect on [the
claimant's] ability to do basic work activities." SSR 96-3p at
*1. A rating of "not severe" will be found if the plaintiff's
daily activities, social functioning, and concentration catego-
ries are rated at "none" or "mild" along with a rating of "none"
in the area of episodes of decompensation. CFR ß404.1520a(d)(1).

18

Furthermore, the ALJ must document the evidence considered in reaching a conclusion regarding the severity of mental impairments. C.F.R. ß404.1520a(e)(2). Such evidence includes significant history, laboratory and examination findings, and functional limitations that were considered. C.F.R. ß404.1520a(e)(2). In addition the ALJ "must include a specific finding as to the degree of limitation" in the three functional categories set forth above. C.F.R. ß404.1520a(e)(2).

The ALJ's decision at Step Two will be upheld if the decision is supported by substantial evidence and based on the proper legal criteria. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005)(internal citations omitted). Conversely, "[t]he decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Briscoe,* 425 F.3d at 351 (internal citations omitted). Furthermore, "the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Id.*

Here, the ALJ's decision that Nunez's mental impairment was "not severe" is not supported by substantial evidence. First, ALJ Wilkin's 2002 discussion of Nunez's mental impairments, which was incorporated into the ALJ's 2004 decision, heavily relies upon Nunez's work history at Step Two. (Tr. 87) However, SSR 96-3p forbids the use of "age, education, and work experience" in the determination of an impairment's severity at Step Two. But more importantly, the ALJ did not address the functional impairment ratings set forth by Dr. Pressner, who found that Nunez had a

19

"moderate" restriction in his activities of daily living. (Tr. 385) Pursuant to SSR 96-3p, the ALJ "*must* find that the impairment(s) is severe and proceed to the next step" under these circumstances, "even if the objective medical evidence would not in itself establish that the impairment(s) is severe." SSR 96-3p, at *2 (emphasis added).  Thus, ALJ Wilkin was required to find that Nunez's mental impairments were severe at Step Two.

In order to satisfy a Listing at Step Three, "the claimant must satisfy all of the criteria of the listed impairment." *Maggard v. Apfel*, 167 F.3d 376, 379-80 (7th Cir. 1999).  The burden of proof is on the claimant to show that he meets all of the requirements of the listing. *Id*. Listing 12.05(C) requires that the claimant has a valid verbal, performance, or full scale IQ that falls between 60 and 70 and that the claimant must show that he suffers from some other limitation, mental or physical, that imposes a significant additional work-related limitation. 20 C.F.R. Pt. 404, Subpt. P, App. 1. ß12.05.  *See Maggard*, 167 F.3d at 380. *See also Felver v. Barnhart*, 243 F.Supp.2d 895, 904 (N.D. Ind. 2003).  The Commissioner concedes that Nunez meets one, if not both, of these requirements. (Response Brief, pg. 15). *See also Maggard*, 167 F.3d at 380; *Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986); *Elster v. Barnhart*, No. 01 C 4085, 2003 WL 124432, at *5 (N.D. Ill. Jan. 13,  2003) (holding that a severe impairment meets the second requirement of listing 12.05(C), a significant work-related limitation). However, the Commissioner

20

disputes that Nunez meets the criteria set forth in the introductory diagnostic paragraph for Listing 12.05.

The introductory paragraph for Listing 12.05 states, "mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested in the developmental period; i.e., the evidence demonstrates or supports the onset of the impairment before the age of 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1. ß12.05. *See Fischer v. Barnhardt*, 129 Fed. Appx. 297, 301-02 (7th Cir. 2005). "Adaptive functioning" refers to "activities of daily living and social functioning." *Fischer*, 129 Fed. Appx. at 301-02. "Significant subaverage general intellectual functioning" does not require a formal diagnosis of mental retardation, nor is it synonymous with the definition of mental retardation in the Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition (DSM-IV). *See Maresh v. Barnhart*, 431 F.3d 1073, 1074 (8th Cir. 2005). Rather, the ALJ must utilize one of the "measurement methods recognized and endorsed" by the four major professional organizations that deal with mental retardation to assess whether a plaintiff falls within the criteria set forth in the introductory paragraph of Listing 12.05. *See* 67 Fed. Reg. at 20,022. Once the ALJ applies one of these standards, rather than an ad hoc rationalization of mental impairment, the ALJ's decision may be evaluated for its consistency with the substantial evidence. *See Barnes v. Barnhart*, 116 Fed. Appx. 934, 942 (10th Cir. 2004).

21

As set forth above, substantial evidence does not support the ALJ's decision that Nunez does not have a "severe" mental impairment at Step Two. Therefore, the ALJ should have considered whether Nunez's mental impairments met Listing 12.05(C) at Step Three, particularly given that the Commissioner has conceded all requirements of the Listing except the diagnostic definition set forth in the introductory paragraph and Nunez was "moderately" impaired in his activities of daily living.  20 C.F.R. ß404.1520(e), ß416.920(e).  Although the ALJ incorporated his 2002 statements regarding Nunez's mental condition in his 2004 decision, the court notes that the 2002 decision did not consider Nunez's mental condition past Step Two. Because the court cannot make findings for the Commissioner, this case must be remanded so that the ALJ can consider whether Nunez falls within the diagnos-tic definition in the introductory paragraph of Listing 12.05(C). The ALJ shall apply a "standard consistent with the Commis-sioner's directive" to complete this analysis. *See **Barnes***, 116 Fed. Appx. at 942.

Because the ALJ's deficiencies at Steps Two and Three necessarily affected the RFC he provided to the Vocational Expert at Step Five, the court will not reach the plaintiff's arguments with respect to his mental RFC at Step Five nor address Nunez's remaining arguments.  However, for the sake of thoroughness, the court will briefly reach the argument that  the ALJ failed to assess properly Nunezís physical impairments in completing his

22

RFC, including his hand impairments, neck arthritis, and inability to sit and stand.

The ALJ is required to evaluate the record fairly. *See* **Golembiewski v. Barnhardt**, 322 F.3d 912, 917 (7th Cir. 2003). In reaching a decision, he is not required to address every piece of evidence in the record. *See* **Schmidt v. Barnhart**, 395 F.3d 737, 744 (7th Cir. 2005) However, ignoring conflicting evidence prevents the reviewing court from determining if the decision is supported by the weight of the evidence.

The ALJ's decision appears well-founded with respect to Nunez's neck impairments.  The record shows that Nunez only complained of neck pain on three occasions prior to March 2001: July 6, 1998, August 6, 1998, and March 1999. (Tr. 237, 246, 248) Nunez did not complain again until he had a neck spasm in October 2001, nearly two and one-half years later. (Tr. 22) He was not diagnosed with arthritis in his neck until October 2002. (Tr. 21-22)  On these facts, the court cannot find that the ALJ erred in concluding that Nunez's neck did not contribute to his impairments prior to the expiration of his disabled status.

However, neither the 2004 nor the 2002 decision adequately addresses the state of Nunez's peripheral neuropathy during the relevant period.  The ALJ focuses exclusively on carpal tunnel syndrome, which was not diagnosed until August 2002, as the reason for Nunez's hand pain and numbness in the 2004 decision. Although he acknowledges in the 2002 decision that these symptoms can be attributed to peripheral neuropathy which was diagnosed in

1999, the ALJ does not consider the impact of Nunez's neuropathy on his hands and arms at all.

Nunez began to complain to Dr. Chudgar of tingling and numbness in his hands and arms in March 1999. (Tr. 237) His subsequent medical records show repeated complaints of hand and arm pain/numbness, which Dr. Chudgar attributed to neuropathy and prescribed increasingly strong medications. (Tr. 234, 230-31, 340, 343, 370) In July 2000, Dr. Chudgar stated that Nunez would have limitations in lifting, pushing, and pulling due in part to his peripheral neuropathy. (Tr. 315) In September 2000, Dr. Chudgar repeated that Nunez was limited to lifting less than 10 pounds and in pushing or pulling. (Tr. 302-04) By contrast, consultive examiner Dr. Odeluga reported that Nunez had normal sensation and strength in his extremities. (Tr. 345) Dr. Odeluga did not explicitly reject Dr. Chudgar's conclusions regarding Nunez's limitations on pushing, pulling, and lifting, and both Drs. Chudgar and Odeluga appeared to agree that Nunez had no problems with grasping or fine manipulation. (Tr. 317, 345) Non-examining consultive physician Dr. Bastnagel, then, was the only physician to conclude that Nunez had an unlimited ability to push and pull prior to December 2001. (Tr. 362)

While the Commissioner focuses on Nunez's ability to grasp and manipulate as evidence that he could perform work in the economy, the court notes that the ALJ's RFC determination did not incorporate any of the pushing or pulling limitations suggested by Dr. Chudgar, or reference pushing/pulling at all. (Tr. 23)

24

Given that a treating source's opinions are typically accorded controlling weight, ALJ Wilkin was required to provide some explanation why he preferred the opinion of a non-examining consultive physician over that of a physician who had treated Nunez for many years. *See* 20 C.F.R. §404.1527(d)(2). *See also* **Gudgell v. Barnhart**, 345 F.3d 467, 470 (7th Cir. 2003); **Books v. Chater**, 91 F.3d 972, 979 (7th Cir. 1996) (*quoting* **Stephens v. Heckler**, 766 F.2d 284 (7th Cir. 1985)).  Similar problems arise with the evidence on Nunez's ability to sit and stand during the relevant period.

Finally, Nunez argues that the ALJ failed to comply with Social Security Ruling 00-4p when he did not ask VE Fisher whether the VE's testimony conflicted with the Dictionary of Occupational Titles ("DOT"). SSR 00-4p places an affirmative duty on the ALJ to

> [i]dentify and obtain a reasonable explana-
> tion for any conflicts between occupational
> evidence provided by VEs or VSs and informa-
> tion in the Dictionary of Occupational Titles
> (DOT), including its companion publication,
> the Selected Characteristics of Occupations
> Defined in the Revised Dictionary of Occupa-
> tional Titles (SCO), published by the Depart-
> ment of Labor, and [e]xplain in the determi-
> nation or decision how any conflict that has
> been identified was resolved.
>
> SSR 00-4p, at *1

However, the Seventh Circuit interprets this Ruling to "[require] an explanation only if the discrepancy was 'identi-fied' that is, if the claimant (or the ALJ on his behalf) noticed the conflict and asked for substantiation." **Donahue v. Barnhart**,

279 F.3d 441, 446-47 (7th Cir. 2002).  *See also* ***Prochaska v. Barnhart***, ___ F.Supp.2d ___, 2005 WL 901202, at *14 (W.D. Wis. Apr. 19, 2005) (holding that the ALJ's duty to inquire into discrepancies "arises only if the claimant (or her lawyer) explores a discrepancy.").  Otherwise, "an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the *Dictionary's*." ***Donahue***, 279 F.3d at 446. Failure by the plaintiff or his counsel to raise the issue at the ALJ hearing constitutes waiver.  *See* ***Buchholtz v. Barnhart***, 98 Fed. Appx. 540, 546-47 (7th Cir. 2005); ***Donahue***, 279 F.3d at 447 ("Raising a discrepancy only after the hearing, as Donahue's lawyer did, is too late."); ***Prochaska***, 2005 WL 901202, at *14.

Nunez was represented by counsel at the time of the ALJ hearing, but he failed to challenge the VE's testimony.  As a plaintiff represented by counsel is presumed to present his best case, Nunez has waived his arguments pertaining to the DOT. *See* ***Glenn v. Secretary of Health & Human Services***, 814 F.2d 387, 391 (7th Cir. 1987).

————————————

For the foregoing reasons, the Motion for Summary Judgment or Remand filed by the plaintiff, Roberto Nunez, on April 4, 2005 is **GRANTED.**

ENTERED this 16th day of February, 2006

s/ ANDREW P. RODOVICH
United States Magistrate Judge